# United States District Court

## District of Delaware

Robert W. Hassett 3rd.

      Petitioner

V.

Richard Kearney, Warden

State Prison Delaware,

      Respondent      0 5 - - 6 0 9



FILED

AUG 17 2005

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## Petitioners Appendix for Brief In Support of Habeas Corpus

Robert W. Hassett 3rd.
Pro se.
S.C.I.
P.O. Box 500
Georgetown, Del. 19947

## Table of Contents

**Exhibits**                                                                                          **Page**

A-1: Affidavit from Jason Coggin……………………………………………… 1

A-2: T.T. Coggin Direct, Vol. B. Pg. 163-164………………………………… 2

A-3: T.T. Coggin Cross, Vol. C. Pg. 75-76…………………………………… 4

A-4: T.T. Cosgrove closing arguments; Vol. G. Pg. 64-65…………………… 6

A-5: T.T. Cosgrove, Vol. G. T.T. Pg. 66……………………………………… 8

A-6: T.T. Cosgrove, Vol. G. Pg. 69…………………………………………… 9

A-7: Barnett Cross (Evidence Hearing)……………………………………… 10

A-8: Weiss Direct (Evidence Hearing)……………………………………… 15

A-9: Mental Health records…………………………………………………… 17

A-10: Letters to doctors……………………………………………………… 21

A-11: Letter to counsel………………………………………………………… 22

A-12: Weiss cross (Evidentiary Hearing)…………………………………… 23

A-13: Weiss cross (Evidentiary Hearing)…………………………………… 25

A-14: Barnett cross (Evidentiary Hearing)………………………………… 29

A-15: Weiss cross (Evidentiary Hearing)…………………………………… 32

A-16: Weiss cross (Evidentiary Hearing)…………………………………… 33

A-17: Jury deliberations, T.T. Vol. H. Pg. 4………………………………… 34

A-18: T.T. cross examination Robinett Vol. D. Pg. 43-44………………… 35

A-19: T.T. cross Coggin Vol. C. 72………………………………………… 37

A-20: T.T. cross Angelini Vol. D. Pg. 89-94……………………………… 38

A-21: T.T. Affidavit from Dr. Bora………………………………………… 44

A-22: Affidavit from Eddie Merdith…………………………………………………… 49

A-23: T.T. cross Det. Curtis Brown, Vol. F. Pg. 149……………………………… 52

A-24: T.T. Hawkins vol. C. Pg. 27-28……………………………………………… 53

A-25: Letter by Barnett……………………………………………………………… 55

A-26: T.T. afternoon session Vol. B. Pg. 89-92…………………………………… 58

A-27: Letter to Barnett from Judge………………………………………………… 62

A-28: Letter to Prothonatary………………………………………………………… 63

A-29: Letter to Barnett from Judge………………………………………………… 64

A-30: T.T. closing rebuttal argument Vol. G. Pg. 88-105………………………… 65

A-31: cross examination Hassett Vol. F. Pg. 103-104……………………………… 83

A-32: Docket sheet…………………………………………………………………… 85

A-33: Motion to Disqualify………………………………………………………… 86

A-34: Letter to Judge………………………………………………………………… 88

A-35: Letter to defendant…………………………………………………………… 90

I, Jason Coggin, hereby swear that the statement I am giving is the truth. I was not coerced, bribed, or threatened to give this statement.

The statement that I gave as a witness for the prosecution in Robert W. Hassett 3rd's trial was not the truth. Not only was it not the truth, but I was coerced by Jim Adkins, the prosecutor. Jim Adkins told me what to say and what I was not to say. He also gave me information to say at trial. Mr. Adkins also threatened me by saying that if I did not testify to the effects of what he and the police told me to say, then I would go to prison. So, due to my fear of going to prison, I lied on the witness stand and prior to the trial.

Therefore, I believe that Robert W. Hassett 3rd was not given a fair trial. Because I lied on the witness stand, and I was not the only one threatened to give a false testimony on the witness stand. Everything that I testified to regarding May 14, 2000 and the events that took place were lies, given to me by the police and Jim Adkins.

I, Jason Coggin, have given this statement by my own free will, with the understanding of the perjury law. I swear that this statement is the truth.

Signature: _Jason Coggin_      Date Signed: 8-23-02
Print: _Jason W Coggin_

Witness Signature: _Charles Hignutt_      Date Signed: 8-23-02
Print: _CHARLES HIGNUTT_

Charles W. Hignutt
State of Delaware, Notary Public
My Commission Expires 1-16-05

A - 1

pg 1

COGGIN - Direct

1    struck as non responsive.

2             THE COURT:  The last comment by this

3    witness is stricken from the record.  The jury shall

4    disregard it in its entirety.

5    BY MR. ADKINS:

6        Q    The question is not what were you thinking

7    about doing or what were you going to do.  I want to

8    know what you saw him do and what happened next.

9        A    He stabbed the wall.  Then he sat down and

10   started talking to me.  We were sitting there

11   chilling.  We took another bong hit.  Then I'd say

12   it was about a half hour later he called Sherri and

13   he told me he was going to get Sherri to come over

14   there and give him some Xanax for some weed.  He was

15   going to give her weed for Xanax, like a trade or

16   something.

17            Then he got up, he went outside.  Whenever

18   he went outside, I heard Sherri scream, Willie,

19   Willie.  And whatever he did, he come back inside

20   and he went right straight to the bathroom.  I was

21   sitting on the couch at the far end.  Whenever he

22   come in, I didn't really pay no attention to him.

23   He went right to straight to the bathroom.

1       Q       When he went to the bathroom, did you hear

2       anything in the bathroom, any water running,

3       anything?

4       A       I heard water, but I didn't think about

5       nothing.

6       Q       Then what happened next?

7       A       He come into the living room and I was

8       sitting there.  He had a knife in his hand and he

9       was like, I did it.  I did it.  And I was like what

10      are you talking about.  He was like I finally killed

11      her.  And then he was like now you're going to come

12      out here and help me carry her inside.  If not,

13      you'll be down there laying with her.

14      Q       Do you know what kind of knife he had in

15      his hand?

16      A       Yeah.

17      Q       Had you ever seen it before?

18      A       Yeah.

19      Q       Can you describe it?

20      A       Yeah.  It's like brass knuckles and has a

21      long sharp blade on it.

22      Q       Do you know whose knife that is?

23      A       Willie's.

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A-2

pg3

JASON COGGIN - CROSS

1    Q.    That Willie Hassett had killed Sherri, you

2    told them that in your second statement?

3    A.    Yeah.

4    Q.    Or at least the truthful part of the first

5    statement, right?

6    A.    Yeah.

7    Q.    Were you scared then?

8    A.    Yeah.

9    Q.    What made you change your mind in your story?

10   A.    Because the cops talked to me.

11   Q.    Because the cops talked to you?

12   A.    Yeah.

13   Q.    Because the cop said we are not sitting here

14   trying to pin anything on you, all we are just trying

15   to do is confirm the statement, do you remember the

16   policeman saying that to you?

17   A.    No, I don't.  I remember him saying, tell me

18   the truth and everything will be all right.

19   Q.    At that point you knew what the truth was

20   that he wanted, didn't you?

21   A.    No, I didn't.

22   Q.    You knew they wanted you to name Willie

23   Hassett as the murderer, didn't you?

DAVID WASHINGTON
Official Court Reporter

A-3.

pg4

C-76

JASON COGGIN - CROSS

1      A.   No, I didn't.

2      Q.   You knew that was the truth he wanted you to

3   say?

4      A.   No, I didn't.

5      Q.   That's what you told him, didn't you?

6      A.   No, I didn't.

7      Q.   You didn't tell him that?

8      A.   Yes, I told him that, but it's not what he

9   wanted to hear.

10      Q.   It's not what he wanted to hear.  On Page 18

11   of your statement:  He's not saying you did anything

12   wrong.  He is saying that you just confirmed what

13   Willie said and then left.  Like you were walking home

14   to grandmom's and then Willie leaves in the car.  We

15   are not trying to sit here and pin anything on you,

16   son.  What we are trying to do is just confirm the

17   statement.  And he is saying that you just confirmed

18   what Willie told him:  I just killed my stepmother and

19   he's got a knife in his hand that he ends up throwing

20   down right outside the house; didn't the policeman

21   tell you that?

22      A.   I don't know.  I don't remember.

23      Q.   You don't remember it?

DAVID WASHINGTON
Official Court Reporter

A-3

Pg 8

G-64

1    dad.

2            Further along in the story, the defendant

3    said he was sitting on the steps.  Jason came out with

4    a knife and he sat there and watched his friend stab

5    the stepmother that he loved twenty-six times.  Then he

6    goes and helps Jason Coggin pull out the knife that is

7    stuck in her chest.

8            But he was in shock, ladies and gentlemen.

9    But it wasn't the kind of shock where he would forget

10   to get Sherri Hassett's car keys off of her body so he

11   could get to his mom's house.  It wasn't the kind of

12   shock that he couldn't take Sherri's car and drive it

13   up to Harrington.

14           It wasn't the kind of shock that would make

15   him want to go to a neighbor and report what his friend

16   had done.  It wasn't the kind of shock that made him

17   stop by a police station and just let them know.  It

18   wasn't the kind of shock that made him forget to drive

19   back roadways because he didn't have a driver's

20   license.

21           It wasn't the kind of shock that prevented

22   him from thinking to hide the car in the bushes at the

23   hog farm in Harrington out of sight of the road and

1   miles from his mother's house that he was in a hurry to

2   get to.

3          It wasn't the kind of shock that made him

4   forget to change his bloody clothes and leave them in

5   his mom's house, only to tell police later that he

6   threw them away in some kind of trash container near

7   where the car was back on the hog farm.  It wasn't the

8   kind of shock that, as the police were taking finger-

9   nail scrapings, he told them, "You are not going to get

10  anything off of me.  I never touched her."  It wasn't

11  that kind of shock, ladies and gentlemen.

12         Back to "Who?," "What?," "When?," "Where?,"

13  and, "How?"  We know the "What?" is the brass-knuckled

14  knife.  That did that to Sherri Hassett.  The "Where?"

15  was 1163 Brickyard Road, ladies and gentlemen.  Right

16  there (indicating).  There it goes down (indicating),

17  bloodstain outside of the entrance to the apartment.

18         That is the "Where?," ladies and gentlemen.

19  That is where the defendant made Jason Coggin help drag

20  his stepmother's body into his own apartment.  That's

21  where the knife was found right where Sherri Hassett's

22  car was parked.

23         "When?," ladies and gentlemen?  It was

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-4

Pg 7

G-66

1   Mother's Day last year about 1:00 o'clock in the

2   morning. And "Why?" "Why?" is going to give you

3   "Who?" And "Why?" is motive. Jason Coggin had no dog

4   in the fight at the Hassett residence. There was no

5   motive for Jason Coggin to kill Sherri Hassett. He

6   wasn't getting kicked out of his house. His father

7   hadn't told him, "I am not your dad anymore." He had

8   parents to go home to and a bed to sleep in.

9   Jason Coggin was the dupe. Not a smart guy.

10  And his best friend used him. His best friend used him

11  to help carry Sherri Hassett's body into his house, and

12  his best friend, the defendant, Willie Hassett, did the

13  ultimate reversal. He then put the finger on Jason

14  Coggin.

15  Willie was out. George told him that on the

16  phone. His present life was over. No more partying

17  with his friends at his own house. George made him mad

18  by saying mean things to him on the phone, and Sherri

19  was always bugging the defendant for marijuana. George

20  said on the 911 tape, "She wanted me to call somebody

21  to get her some drugs, and I'm tired of it. She's over

22  there like five times, so I killed her."

23  And to Orville Robinette, not three days

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

G-69

1    is no defense.

2            Manslaughter was the second lesser-included

3    offense that the Judge instructed you on.

4    Manslaughter, under 11 Delaware Code, Section 632,

5    states,

6            "A person is guilty of manslaughter when

7        the person recklessly causes the death of

8        another person."

9            It is the same "recklessly" or "reckless"

10   definition that went with murder in the second degree.

11   Ladies and gentlemen, the defendant did not act

12   recklessly.  There were twenty-six wounds -- sixteen

13   deep stab wounds -- in Sherri Hassett's body.  That is

14   not reckless.  That's intentional.

15           Ladies and gentlemen, the defendant, Robert

16   William Hassett, 3rd, intentionally murdered his

17   stepmother, Sherri Hassett, with a knife.  The evidence

18   has shown this beyond any reasonable doubt.

19           Justice demands a verdict of guilty against

20   the defendant for the first-degree murder and the

21   possession of a firearm during the commission of a

22   felony.  Ladies and gentlemen, return that verdict.

23           Thank you.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

BARNETT - Cross

1      Q      But isn't it true that I told you I had

2    issues and I was on medications?

3      A      Yeah, you said you were on medication and

4    you had issues.

5      Q      For mental issues?

6      A      Yeah.

7      Q      Okay.  Do you have a Ph.D. in psychiatry?

8      A      No, I am just a human being.

9      Q      Are you able to discern if a person can or

10   cannot properly make choices?

11     A      I think as a layman I am entitled to view an

12   opinion of what I see and from what I saw from

13   talking to you, you were perfectly rationale and were

14   quite capable of making your own decisions every time

15   I talked to you.

16     Q      So you think I was sane then?

17     A      Sure.

18     Q      Okay.  If you thought that, then why didn't

19   you test the shirt that was given to you by George

20   Hassett being that it was believed to be Jason

21   Coggin's shirt that was worn during the murder?

22     A      What shirt are you talking about?

23     Q      The shirt that was brought to your office by

BARNETT - Cross

1    George Hassett that was believed to be the actual

2    shirt that Jason Coggin was wearing during the

3    murder.  If you believed the defendant was sane, why

4    didn't you test that shirt?

5        A    Why didn't I test the shirt?

6        Q    Or have any investigation done with it?

7        A    I don't recall when that shirt was brought

8    to my office.  I believe it was brought to my office

9    following the trial.  I don't think I had possession

10   of it during the trial.

11           THE COURT:  This is limited to your mental

12   competency, Mr. Hassett.

13           THE DEFENDANT:  Well, we go to show that he

14   believed I was mentally sane and had no mental issues

15   going off his statement that I was sane.  Jason

16   Coggin was the murderer, and that is the way I wanted

17   to proceed.  Then, that would go to help my defense

18   and show that I was mentally stable at the time.

19           I will move on.

20   BY THE DEFENDANT:

21       Q    Do you know what the symptoms of

22   schizophrenia are?

23       A    No, I don't.

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

SUP.    A-7    pg 11

BARNETT - Cross

1    Q    So it's safe to say you would not know if

2    someone is mentally ill or suffers from schizophrenia

3    or anything?

4    A    I could only base my opinion on the time

5    that I spent with the person.  I couldn't base it on

6    any medical evidence of schizophrenia or how that

7    person may react out of my presence.  No, I can only

8    comment that when I saw you, you appeared to be sane,

9    rationale, and fine to me.  I can't say how you

10   appeared in your cell at night at midnight.  No, I

11   can't say that.

12   Q    But it would be safe to say if you know that

13   a person may be mentally ill, you would have

14   evaluated them to be sure they could stand trial or

15   even assist in his own defense?

16   A    You were quite capable of assisting in your

17   own defense.  Based upon the information that I had

18   and your choice of the defense that you chose, no, I

19   saw no reason to have you evaluated for any mental

20   illness, no.

21   Q    You see no reason, but I told you I was on

22   medication for mental illness?

23   A    Yes.  You were on medication.  You didn't

BARNETT - Cross

1    tell me it was for mental illness.  You didn't tell

2    me mental.

3         Q    I remember that that is my words.

4         A    If you remember saying it, you did.  I am

5    not going to say you didn't, if that is your

6    recollection.

7         Q    Do you know what Thorazine is?

8         A    It's a medication.  I don't know what it's

9    for.

10        Q    Well, it's for schizophrenia, hearing voices

11   and so forth, delusions, and hallucinations; did you

12   know that?

13        A    I don't know what you are telling me is fact

14   or not.

15        Q    It's fact.  It came out of the medical

16   dictionary.  Did you even know the defendant was on

17   this medication as well Tegretol, Paxil, Vistaril,

18   any of those medications?  Did you know that he was

19   on any of those specific medications?

20        A    I don't recall.

21        Q    Okay.  Is it because you didn't look at my

22   mental history, my medical chart, or anything like

23   that?

BARNETT - Cross

1    A    Possible.

2    Q    So it's possible you didn't look even into

3    none of that issue after I told you I was on

4    medication for mental illness?

5    A    Yes.

6    Q    Okay.  Did you even know that Dr. Weiss was

7    a psychiatrist at SCI?

8    A    I knew his name.

9    Q    But you didn't know that he diagnosed me?

10   He diagnosed me as schizophrenia, personality

11   disorder?

12   A    I don't know what he diagnosed you.

13   Q    So you didn't know that he diagnosed me with

14   bipolar, antisocial disorder, schizophrenia,

15   substance abuse, alcohol dependency?  You didn't know

16   about none of that, correct?

17   A    Not his diagnosis, no.

18   Q    Okay.  You didn't know that the defendant

19   suffered from hearing voices, hallucinations,

20   schizophrenia, depression, none of those, correct?

21   A    No.

22   Q    Okay.  Now, before the trial, I was off the

23   medication.  Do you think that could have made a

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

SUP    A-7    PG 14

WEISS - Direct

1    Q    Could you please explain to the Court what

2    the results were of your evaluation?

3    A    On May 16th, 2000, I see here I diagnosed

4    him to have several diagnoses, one polysubstance

5    abuse, another alcohol dependance, another

6    schizoeffective disorder, which is manic depression,

7    bipolar, but a person in bipolar, usually during the

8    manic stage with elevated grandiose or depression

9    stage, feeling very depressed, can have psychotic

10   symptoms.

11        Schizoeffective means there may be times

12   when he was relatively not that agitated or depressed

13   but still may have had some auditory hallucinations

14   or paranoia other psychiatric symptoms, stress

15   disorder which would refer to traumatic events which

16   he still had nightmares and flashbacks, but he was

17   also diagnosed to antisocial personality disorder,

18   which would refer to how responsible he was, did he

19   have empathy, and his ability to function in a

20   normally accepted way, and on his medal records he

21   was allergic to cats and dogs and unknown

22   medications, and he was given medication for

23   depression, and I had him on several medications.

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

sup   A-8   

WEISS - Direct

1     Q     What medications did you prescribe, and what

2     were they for?

3     A     He was on Tegretol, seizure medicine, used

4     as antimanic medicine.  Thorazine, which is

5     antipsychotic medicine also antimanic.  Benadryl

6     which would be for side effects or sleep and

7     sedation, and Paxil which was antidepression.  Also

8     been, at some point, on Tricyclic antidepressant,

9     some of the old antidepressants.

10    Q     And what was the course of the treatment,

11    and did you see any major mental health issues with

12    Mr. Hassett?

13    A     Well, at one point, he reported the

14    medication was effective.  There was less voices.  He

15    was doing better.  Later, he requested to come off

16    the medicine.  He felt it wasn't doing much for him.

17    He was gaining weight on it.  He didn't need it.  So

18    we discontinued his medication, I believe, on

19    December 12 of 2000, and then he was observed by me

20    to see if he was having any relapse, and after that,

21    he was followed by mental health, who if he were

22    having a relapse would refer him back to the

23    physician again.

Sussex Correctional Institution
Box 500, Georgetown, DE 19947
302-856-5563 or fax 302-856-9566

**First Correctional Medical**

# Fax

**To:** Jim Adkins, Attorney General's office    **From:** Roberta Bums, MD

**Fax:** 302-856-5369    **Pages:** 26, Including cover

**Phone:**    **Date:**

**Re:**    **CC:**

☐ Urgent  ☐ For Review  ☐ Please Comment  ☐ Please Reply  ☐ Please Recycle

Enclosed! 4 refusals of psych meds, 13 progress note pages, 6 medication administration issues.

Progress Notes: 5/14/00 — intake note by nurse

5/15/00 Note by mental health Counselor Karen Clark Larson (and N.C nurse)

5/16/00 Dr Weiss initial evaluation

Diagnosis! I Poly substance abuse, alcohol abuse dependence
         Schizoaffective disorder

II ASPD = anti-social personality disorder
P: continue on enforcing

- **Confidentiality Notice:** The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged and confidential. The information is intended only for the use of the individual or entity named above. If you are not the intended receipt, you are hereby notified that any disclosure, copying, distribution, or taking any action based on the contents of this telecopied information is strickly prohibited. If you have received this telecopy in error, please immediately notify the sender to arrange for return of the original documents.

A-9

JWP

PG17



**PHS**

PRISON
HEALTH
SERVICES
INCORPORATED

## PROGRESS NOTES

| Date/Time | Inmate's Name: Hassett, Robert | D.O.B.: / / |
|---|---|---|

7/14/05 SEI
_130
Recived from P.T. 9/m calm & compleent.
Hwhitley LPN

5/8/00 SEI
_700
S) C/O HA
O) VS 110/88 979 70 16
A) Alteration in Comfort: Pain R/T HA
P) Tylenol offered. — Hwhitley LPN

I DIO
5/5/00
S: Seen by Mental health for CPO
O: Pt tearful states he has hx of psych and
meds but doesn't know what. Talked about
abuse from father and his hx of drug use.
states hasn't had anything
A: Tearful but calm. Denies feeling
suicidal or homicidal. Has capacity
to inform if feelings change.
P: will see Dr Weiss for evaluation
tomorrow. Resumes CPO. — J Clark Counc.

5-16-00
3CI 05
8 pm
19 y/o WSO [?] felt'd charges murder 1st degree
(step mom) psychiatric hx - outpt pt can't rember
more. School tearful HS 9th grade spelled
for fighting. No special ed classes. Legal hx -
fighting & stealing X 2. On probation for conspiracy
to burglary. Irritated ⊕ hurt one reds ⊕ engage ⊖
alert bright pleasant PTSD (+) hallucinators + or sleep
delusions (paranoia) recent spells of mood.
Mania (+) Depression (+) (over)

| | TIME | NOTES |
|---|---|---|
| | | S feel bad today _energy, still half high _Tilen_ |
| | | O b-9 cardmy _____ |
| | | A cm more ____ |
| | | P _____ tegild. W____ms |
| | 08 | S nausea — ___ help |
| | | O on toyol & tegild |
| | | A While on _ easy ___ |
| | | P give an tegild & KS _____ & ___ |
| 12/8/00 | 0515 | TEGRETOL _____ LEVEL DRAWN THIS AM. I/M TOLERATED WELL. SPECIMEN TAKEN TO MAX MEDICAL FOR PICK UP FROM FRIDGE. 52470997094 ~ M. Thomas RN |
| | | S nausea cant sleep Voices less |
| | | O on lang |
| | | A DC lang |
| | | P _____ f nause & ✓ bloodwork in ____ |
| 12/11/00 | 0920 | S: Seen by Mental health for refusing meds- |
| | | O: Inm states that he doesn't like the way they make him feel. |
| | | A: Calm. Denies feeling suicidal/homicidal. Has capacity to inform. |
| | | P: Had Inm write in his own words, will D/C meds upon request. — Flora__ |

**CORRECTIONAL MEDICAL SERVICES**

**INTERDISCIPLINARY PROGRESS NOTES**

Patient Name: Hessett, Robert    I.D. # 337863    Institution: SCI

| DATE | TIME | NOTES | SIGNATURE |
|------|------|-------|-----------|
| | | S _[illegible]_ | |
| | | O _[illegible]_ | |
| | | A C̄ DC all med - | |
| | | P _[illegible]_ | |
| | | S - no _[illegible]_ - _[illegible]_ | |
| | | O _[illegible]_ | |
| | | A - _[illegible]_ | |
| | | P _[illegible]_ | |
| 4/01 | | S: c/o _[illegible]_ (bite) Bite Now 48 hr. old. | |
| | | O. Red _[illegible]_ c̄ small amt. of swelling on | |
| | | forehead. Pain full too touch. | |
| | | Also c/o H/A | |
| | | T98 P _[illegible]_ R _[illegible]_ B/P 118/70 wt 174/hr | |
| | | ℞ Alter. in comfort related to insect bite | |
| | | ℞ warm compress to AA | |
| | | Tylenol tab ii for Pain | |
| | | Refer to MD. _[signature]_ | |
| 5-11-1 | 0500 | PPD planted ℞ FA. — S Whittle, RN | |
| 514-1 | 0575 | PPD read ℞ FA 0mm — S Whittle, RN | |
| 5-15-01 | 1255 | S- Bug bite over nose near eyebrow | |
| | | on ℞ side -occurred 5-8-01 | |
| | | O- no s/s infection, area completely | |
| | | healed. No visual problems _[illegible]_ | |

Law Offices

# Thomas David Hunter Barnett

512 East Market Street
Georgetown, Delaware 19947
E-mail: TDHBLawyer@aol.com

Telephone: (302)855-9252                                     Fax:  (302)855-9293
Cell Phone: (302)228-5568                                    Pager: (302)441-6567

January 17, 2001

David Sibley, M. D.
834 Walker Road
Dover, DE 19901

        RE:  Robert W. Hassett

Dear Dr. Sibley:

        I have been appointed to represent the above individual in his murder trial.  His mother
has asked that I have him examined by you.

        In order to do so I must know what your fee would be, as I must file a motion with
Superior Court to have your fee approved by the court. I would appreciate it if you could contact
me regarding this matter.

                                Very truly yours,

                                Thomas D. H. Barnett

cc:  Robert W. Hassett
     Deborah Angelini

Ex - A10
pg 21

SUPERIOR COURT
OF THE
STATE OF DELAWARE

Richard F. Stokes
Judge

P.O. Box 746
COURTHOUSE
GEORGETOWN, DE 19947

January 11, 2001

Thomas D.H. Barnett, Esquire
512 East Market Street
Georgetown, DE 19947

RE:   State v. Robert W. Hassett
      ID #0005011315

Dear Mr. Barnett:

        Last week you inquired about the availability of funding for a possible consultation regarding your client's mental state. In order to pursue this - should this course still be of interest - you need to determine the cost and present an application. None of this will change the requirements of Rule 12.2 should that subject come into play.

                                  Very truly yours,

                                  Richard F. Stokes
                                  Judge

RFS:mrs

cc:   Prothonotary
      James Adkins, Esquire

Ex - A - 11
pg 22

WEISS - Cross

1    them knowing, is it possible that I could lie to them

2    during those evaluations?

3         A    Well, if you think you are going to get some

4    gain out of saying -- I think I saw one place in the

5    notes you said the voices, the medicine was causing

6    the voices, which it's not likely unless there was

7    too much antidepressant or no antipsychotic medicine.

8    If the antisocial personality disorder diagnosed is

9    accurate, then your tendency to lie is -- there is

10   not much holding you back from doing that because you

11   don't have what they call a superego or conscious.

12   You lie frequently.

13        Q    So it's very possible that could happen?

14        A    That what could happen?

15        Q    That I lie to them just so they didn't

16   bother me, or so I wouldn't be confined?

17        A    It's possible that you were angry or

18   manipulative or inaccurate, but you expressed a

19   desire to come off the medicine.  We acknowledged the

20   desire.  We reevaluated you, and you didn't appear to

21   be in any acute distress that you immediately had to

22   go back on the medication.

23        Q    Okay.  These disorders they don't just come

WEISS - Cross

1    and go, do they?

2        A    They are cycling so you can say they do come

3    and go because some people get manic every three

4    months.  Some people get manic every three years.  So

5    that's why we prefer people to stay on medicine so

6    when the condition does occur, that they have some

7    control over the extremes of the behaviors.

8        Q    So then it's quite possible if I got off the

9    medication and I had another episode, manic episode,

10   voices, hallucinations, paranoia before my trial?

11       A    Well, on several occasions during that time

12   period, you were evaluated by mental health, and they

13   didn't report that.  So if it occurred, it's not

14   recorded in what I reviewed.

15       Q    But I wasn't evaluated the month that my

16   trial was happening or the time right before my

17   trial?

18       A    I don't recall the last date that mental

19   health evaluated you.  It's in here.

20       Q    So is it possible, all right, that I had a

21   manic breakdown or had a hallucination, auditorial,

22   so forth, the week before trial?

23       A    If you were in the courtroom and you were

WEISS - Cross

1    A    I understand you are not asking me about

2    what might have happened before I met you and

3    interviewed you, but since and afterwards is that

4    what you are asking.

5    Q    No.  What I'm saying is you diagnosed me as

6    schizoeffective, bipolar, antisocial disorder, few

7    other things, those diagnoses don't happen over

8    night, correct?

9    A    Correct.

10    Q    They happen over many years?

11    A    Yes.

12    Q    All right.  Now, is it possible that the

13    defendant had these disorders before he came to

14    prison and before you saw him where you diagnosed him

15    with these disorders?  Were these disorders -- is the

16    defendant capable of committing a crime out of

17    extreme emotional distraught or out of the delusional

18    act without being fully aware of his actions?

19    A    It's most probable that there was part of

20    it.  These conditions existing for quite some time

21    and during a lot of your different behaviors

22    appropriate or unappropriate, they could have had

23    effects to varying degrees but to what effect and



sup.    A-13

WEISS - Cross

1    to --

2         Q    Is it possible?

3         A    There are several possibilities.

4         Q    Mr. Weiss, I want yes or no?

5              THE COURT:  Excuse me.  He wants to explain.

6    He has an opportunity to explain.

7              THE WITNESS:  You want to ask that

8    particular possible point of the question, again?

9    BY THE DEFENDANT:

10        Q    Is it possible, okay, that the defendant

11   could commit an act or a crime with those disorders

12   and not be fully aware of it or not act underneath

13   the delusion that he is protecting himself or act out

14   of extreme emotional distraught?

15        A    An act committed when somebody is manic that

16   they can't pay for when the episode passes.  They

17   have to go back and see if they can return it or

18   what's going to happen.  So manic behavior can effect

19   your behavior.  Depending on the extent of your

20   delusion, it could effect your reaction to your

21   environment, and depression also has some effect, so

22   there are parts of the conditions.

23              While we are on it, I might also add that

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

WEISS - Cross

1    antisocial personality disorder involves lesser

2    degree of having a normal conscious of having empathy

3    towards others and that could also effect your

4    behaviors and that would be in a negative light.  So

5    all of these things can have some effect on your

6    behaviors to some degree of which I cannot say from

7    this time and place what I have in front of me,

8    whether those things were ongoing or not, whether or

9    not you brought them up during your trial, or whether

10   or not they were discussed, or whether or not they

11   were explored I don't know.

12          But you may have had behaviors over the

13   years.  For instance, if the diagnosis of antisocial

14   personality disorder is correct, then there is

15   certainly behaviors that would have been present at

16   least from the age of 15.  So these conditions

17   probably did not occur within moments of your

18   incarceration.  They probably were present, either

19   diagnosed or undiagnosed, for a while, and to what

20   degree they were effecting your behaviors, I don't

21   know.

22          There was some question here whether or not

23   you had any treatment before you came to the facility

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

Sup.    A-13


pg 27

25

WEISS - Cross

1    in the notes, and when the nurses evaluation one part

2    seemed to infer that you had a history; another part

3    inferred that you didn't have a history.  You would

4    know that better than I.

5         Q    Now, you also put in there that the

6    defendant had substance abuse, drugs, alcohol, and so

7    forth.  Given that with the information, could those

8    substances, marijuana, alcohol, cocaine, acid, could

9    those cause the delusions to go farther, or cause my

10   delusions or the auditory problems that I have

11   without the medication, which I am taking now, could

12   that cause it to go into effect to a higher level and

13   cause me to act in irrational ways?

14        A    Cocaine, marijuana, and did you say acid

15   also?

16        Q    Acid, LSD?

17        A    They can have an effect on the above

18   mentioned conditions.

19        Q    Yes or no, is it possible that they could

20   cause me to commit an act that I would never commit

21   under normal circumstances with my conditions?

22        A    There have been cases of people taking angel

23   dust, going out on the street, getting a weapon, and

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A-63

BARNETT - Cross

1   difference in the way of proceeding at trial?

2      A    Not sure I understand your question.

3      Q    I was off medications?

4      A    Off medications.

5      Q    Okay.  Medications for schizophrenia,

6   bipolar, so forth, in your opinion, as an attorney,

7   so forth, do you think that could alter the way I

8   proceeded at trial being off medications?

9      A    I think that question is asking me for a

10  medical diagnosis.  I can't give you one.

11     Q    Answer based on what you saw?

12     A    Based upon what I saw of you, I saw no

13  difference in you.

14     Q    You saw no difference.  But like you said,

15  you are not a Ph.D. or psychiatrist?

16     A    No.

17     Q    So you really wouldn't know?

18     A    I am not saying what I know.  I know what I

19  see.

20     Q    Now, we have a letter that you sent

21  Dr. Sibley about an evaluation, correct?

22     A    Right.

23     Q    So at that point, you must have recognized

BARNETT - Cross

1   the fact that the defendant told you he was mentally

2   ill and you were researching this idea, correct?

3       A    I sent that at the behest of your mother.

4   Your mother wanted it investigated.  I sent the

5   letter.  I looked into it.  We then, as I recall,

6   discussed your defense, and you were not willing to

7   say you stabbed Sherri Hassett.  At that point, I

8   said well no mental defense.  You have to admit that

9   you did it in order to raise that defense, and you

10  said I am not going to do it.

11      Q    Okay.

12      A    And that was the end of it.

13      Q    Even though the evidence said that he didn't

14  commit the crime with the information that, you know,

15  the defendant is telling you, that he has mental

16  problems, and the letter from his mother and the

17  letter from his aunt, June Bramble, wouldn't it be

18  safe for your benefit to know that the defendant can

19  stand trial or even assist?  Wouldn't it be safe to

20  have him evaluated by a psychiatrist?

21      A    Would it be safe?  I presume had I gone

22  through that evaluation we wouldn't be here today.

23  It might have been better had I done it.  But that



BARNETT - Cross

1    doesn't alter my opinion that I didn't believe at the

2    time that you had any mental problems based upon my

3    observation of you.

4        Q    But you don't have a Ph.D. so you don't

5    know?

6        A    No.

7        Q    You were given information, correct, of this

8    and you failed to investigate it, correct?

9        A    I didn't investigate it beyond the inquiry,

10   yeah.

11       Q    So you don't have no recollection of the

12   defendant's, like, actual history or case since the

13   trial either, right?

14       A    Again, I don't understand the question.

15       Q    You don't know anything dealing with the

16   defendant's case or his mental health since the trial

17   ended?  After your direct appeal, of course, you

18   stopped filing up on the case, correct?

19       A    Other than what I have had to do in the Rule

20   61, I have had no contact with your case, no.

21       Q    So you didn't know that the defendant is now

22   on medication now, and without medication that I

23   wouldn't be able to stand up here today and hold an

WEISS - Cross

1    from psychiatrist at times, can't they?

2        A    Well, if you are able to carry on a

3    conversation, even in the period of 15 to 45 minutes,

4    in an interview with a psychiatrist and there is no

5    added input from someone else, who is reporting what

6    took place in the last several hours or days, you can

7    be seen to be stable.

8          But if you were having slurred speech,

9    grandiosity, flight of idea, reporting that you

10   didn't need any sleep, you had high energy, one would

11   expect you had a manic episode.  If you are reporting

12   difficulty sleeping, poor self-esteem, difficulty

13   with energy, crying spells, can't concentrate, one

14   would feel that there is depressive symptoms going

15   on, and if you were stealing things or hearing things

16   or paranoid or delusional, one would feel that there

17   is a psychotic process going on.

18         So other than that you had heard some voices

19   initially, when you started on the medicine the

20   voices had subsided and they didn't appear later in

21   the notes to be a major problem.  There were no

22   blatantly psychotic symptoms during the time that you

23   treated with me, and then the other times after I

WEISS - Cross

1    being, I guess, you say friendly towards others or

2    having communications out of the paranoia, out of the

3    delusion, out of the voices saying whatever they were

4    saying to me at that time?

5        A    Well, you didn't report what the voices said

6    or didn't say to you and whether or not you were

7    depressed, but you were stopped -- you stopped on

8    December 12th from antimanic medicine, antipsychotic

9    medication, which would stop voices, and from

10   antidepressant.  You were asked to come back and

11   check to see if you were okay without medicines and

12   didn't display any need to be immediately put back on

13   those medications.  And then you were seen by mental

14   health over several times, and they didn't report you

15   to be so gravely depressed that you were suicidal or

16   homicidal.  So at least from the documentation that

17   is here, there is no report of any extreme behavior

18   or mood changes.

19       Q    Is it possible through the paranoia that the

20   defendant could lie to them?

21       A    That who could lie to whom?

22       Q    Is it possible through my disorders being --

23   I didn't want somebody to know or I was afraid of

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER



Sup. A-96

H-4

1          THE COURT:  All right.  We're at sidebar.

2   The question we have is, "Under Count 1, murder in

3   the first degree, Element 2, does the defendant,

4   Willy, have to have the intention of killing

5   specifically Sherri Hassett or the intention to kill

6   anyone/someone?"

7          Now, as the jury was instructed in No. 2,

8   the defendant acted intentionally.  That is, it must

9   have been the defendant's conscious object or

10  purpose to cause the death of another person, in

11  this case, Sherri L. Hassett.  Premeditation or

12  deliberation are not required.

13         That instruction follows the commentary to

14  Criminal Code at Page 194.  It was referenced

15  yesterday, 1973.  The sole question is whether it

16  was the defendant's conscious object to kill this

17  victim.  So I think the answer is Sherri L. Hassett

18  was --

19         MR. ADKINS:  Could you just read them that

20  instruction again?

21         MR. BARNETT:  The instruction is perfectly

22  clear.  I don't see how they could have any question

23  about that, as far as understanding the instruction.

KATHY S. PURNELL
OFFICIAL COURT REPORTER

sup.  A-17          pg 34

D-43

ROBINETTE - Cross

```
 1   going to be going out of town."

 2       Q    How much money did you give him?

 3       A    I don't recall offhand.  It was either

 4   twenty-five or fifty dollars cash.

 5       Q    And, Mr. Robinette, you made a statement to

 6   the police about this?

 7       A    Yes.  When I heard, I went to work the next

 8   day and -- or that was Saturday.  That Monday I went

 9   to work, and I asked if Willie was there because I

10   wanted to get some other work done and everything,

11   see if he was going to finish up what he had started,

12   and I heard what happened, and it kind of floored me,

13   actually shocked me.

14          MR. COSGROVE:  If I may have a moment, Your

15   Honor.

16          I have no further questions of this witness,

17   Your Honor.  Thank you, Mr. Robinette.

18                  CROSS-EXAMINATION

19   BY MR. BARNETT:

20       Q    Good morning, Mr. Robinette.  My name is

21   Mr. Tom Barnett.  I am representing Mr. Hassett.  The

22   crime to which you pled guilty; is that a felony?

23       A    Yes, sir.
```

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

Pg 35

Ex- A-18 

D-44

ANGELINI - Direct

1     Q     It is a felony involving dishonesty; is it

2   not?

3     A     Yes, it is.

4          MR. BARNETT:  I have no other questions.

5          MR. COSGROVE:  Your Honor, I would ask that

6   Mr. Robinette be excused.

7          THE COURT:  Mr. Barnett?

8          MR. BARNETT:  I agree.

9          THE COURT:  You are excused.

10                         (Witness steps down.)

11          MR. ADKINS:  The State calls Deborah

12   Angelini.

13   Whereupon,

14                    DEBORAH ANGELINI

15   was called as a witness by and on behalf of the State

16   of Delaware and, having been first duly sworn, was

17   examined and testified as follows:

18                    DIRECT EXAMINATION

19   BY MR. ADKINS:

20     Q     Good morning, Ms. Angelini.

21     A     Good morning.

22     Q     Ms. Angelini, I noticed you brought some

23   papers --

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER


EX-A-18
Pg. 36

C-72

JASON COGGIN - CROSS

1   came?

2       A.   Sat there and chilled and got high.

3       Q.   Chilled.  Did you smoke some more?

4       A.   Yeah.

5       Q.   Did you drink?

6       A.   No, not yet.  Not right then, no.

7       Q.   Not then.  What did you do after Kate got

8   there?

9       A.   Took her four wheeling.

10      Q.   You say you took her four wheeler.  What do

11  you mean?

12      A.   We borrowed the four wheeler.

13      Q.   Took it where, did you go somewhere on it?

14      A.   We went down Airport Road, some dude's house.

15  I don't even know him.  I don't know his name.  We got

16  off.  He was talking to the dude, got some type of

17  part for a go cart.  Then I was sitting on the four

18  wheeler.  We came back.  We went to the Cock & Bull

19  and got some beer for me, him, and Kate.  Then we went

20  back to his house.

21      Q.   So you went back to Willie's then?

22      A.   Yeah.

23      Q.   Do you have any idea what time that would

DAVID WASHINGTON
Official Court Reporter



Ex-A-019    pg. 037

D-89

ANGELINI - Cross

1    any, were you seeing?

2         A    Also a psychiatrist.

3         Q    Also a psychiatrist?

4         A    (Witness nodding head in the affirmative.)

5         Q    Why were you seeing a psychiatrist then, for

6    the same things or different disorders?

7         A    I had a nervous breakdown.

8         Q    When did you have that nervous breakdown?

9         A    Eighty-nine.

10        Q    And have you been continually under the care

11   of a psychiatrist since 1989?

12        A    Yes, sir.

13        Q    When you had your nervous breakdown in 1989,

14   what happened?

15        A    I almost became a vegetable. Excuse me.  I

16   had a nervous breakdown because I had lost my son

17   three years prior, and I went through a lot of

18   trauma, and I finally lost it, and I was in such bad

19   shape that they had to put me in a hospital.

20        Q    So you were hospitalized?

21        A    (Witness nodding head in the affirmative.)

22        Q    And how long did that hospitalization last,

23   if you know?

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

Ex- A    20    pg 38

D-90

ANGELINI - Cross

```
 1      A     About three months.

 2      Q     Three months.  And was that when you began

 3  seeing your first psychiatrist you were diagnosed?

 4      A     Yes, sir.

 5      Q     So from approximately 1989 until about 1994,

 6  you were under the care of your first psychiatrist;

 7  is that correct?

 8      A     Yes, sir.

 9      Q     Have your disorders and symptoms remained

10  pretty much the same in that ten year period?

11      A     Yes, sir.

12      Q     So about 1994, you began seeing your current

13  psychiatrist, and who is that?

14      A     Yes.  Dr. Borer.

15      Q     Dr. Borer?

16      A     Dr. Borer.

17      Q     Is that Dr. Mark Borer in Dover?

18      A     Yes, sir.

19      Q     Is Dr. Borer's diagnosis basically the

20  Bipolar diagnosis?

21      A     No.

22      Q     What is his diagnosis?

23      A     ADHD.
```

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

Ex-A- 20 18        pg 34

D-91

ANGELINI - Cross

1          MR. ADKINS:  Your Honor, may we approach?

2          (Whereupon, counsel approached the bench and

3      the following proceedings were had:)

4          MR. ADKINS:  I've really been trying to give

5      as much leeway as possible in terms of not objecting,

6      but if we are going to go into specific doctors,

7      specific diagnoses and what that means, I think they

8      should have the psychiatrist here if they want to

9      impeach her credibility that way.  I think this is

10     hearsay of the worse kind.  It's hearsay concerning

11     expert witness testimony.

12         MR. BARNETT:  She knows what her disorder

13     is, and she can testify to that.  I'm not asking what

14.    the doctor told her.

15         THE COURT:  Well, you were asking what the

16     diagnosis was from the doctor, and you are getting

17     into things that the doctor should testify about.

18         MR. BARNETT:  I'll rephrase then.

19         THE COURT:  You can ask her what her

20     understanding is.  Nothing more than that.

21         MR. BARNETT:  I was being artful in asking

22     the question, but I think I have a right to inquire

23     because of her direct testimony.  I will refrain

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER
Ex-A-2000                    Pg 40 atd

D-92

ANGELINI - Cross

1    asking what the doctors have told her, but I will ask

2    her understanding of it.

3              THE COURT:  I think it should focus on what

4    her mental state was when she gave the statement.

5              MR. BARNETT:  That's what I'm trying to lead

6    to, Your Honor.

7              THE COURT:  She can have a problem in 1989.

8    You can be under control, so to speak as best one can

9    be, May 14th 2000 or --

10             MR. BARNETT:  A couple more questions.

11             THE COURT:  All right.

12             (Whereupon, counsel returned to the trial

13        table and the following proceedings were had:)

14             MR. BARNETT:  For the record, I will

15   withdraw the last question.

16   BY MR. BARNETT:

17        Q    What is your understanding of your disorder

18   as it applied in May of the year 2000?  What were you

19   being treated for?

20        A    All three of my disorders?

21        Q    What were they?

22        A    ADHD, attention deficit disorder.

23        Q    Attention deficit --

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

ANGELINI - Cross                             D-93

1      A    Wait a minute.  Attention Deficit Higher

2   Disorder, Bipolar, and depression I think.

3      Q    And depression?

4      A    Yeah.

5      Q    May of 2000, that's what you were being

6   treated for?

7      A    Yes, sir.

8      Q    And that's what you were being treated for

9   on the day that you gave your statement to the State

10   Police; is that correct?

11      A    Yes, sir.

12      Q    What is your recollection of those

13   statements today?

14      A    I remember bits and pieces of them.  I

15   remember a lot of stuff that is like mixed-up, but I

16   remember stuff.

17      Q    Were you at all confused on the day you gave

18   those statements?

19      A    Some.

20      Q    Do you believe that the medications you were

21   taking on the day of your statements affected what

22   you may have said or may have been able to remember?

23      A    Yes.

A-20    PY

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

D-94

ANGELINI - Cross

1        MR. ADKINS:  Your Honor, I ask that response

2    be stricken in that is medical opinion.

3        MR. BARNETT:  I don't know that is a

4    medical --

5        THE COURT:  Let's move on.  I'm going to

6    overrule it.  Move onto something else, Mr. Barnett.

7        MR. BARNETT:  Your Honor, I have nothing

8    else to question.

9        THE COURT:  Are you done?

10        MR. BARNETT:  If the Court is restricting

11    me, I have no further questions other than that line

12    of questioning, Your Honor.

13        THE COURT:  Thank you.

14        MR. ADKINS:  I have no further questions,

15    Your Honor.  I ask that she be excused for the day.

16        THE COURT:  Still subject to recall?

17        MR. ADKINS:  You know it's hard for me to

18    say that she would not be subject.

19        THE COURT:  You may step down for the

20    present purposes.  You are not to talk about your

21    testimony with anyone.  You may go home today, but

22    you are subject to being recalled as a witness.

23                    (Witness steps down.)



CHRISTINE L. QUINN
OFFICIAL COURT REPORTER



# Psychiatric Access

...for Central Delaware, P.A.

Mark S. Borer, M.D.
 ABPN & AACAP Board Certified
 Family Psychiatry

Carol S. Bugglin, Ph.D.
 Licensed Clinical Psychologist
 Psychotherapy & Assessment

March 28, 2003

| | |
|---|---|
| **NAME:** | Deborah "Debbie" Angelini |
| **DATE OF BIRTH:** | 4/11/64 |
| **DATE OF INITIAL PSYCHIATRIC EVALUATION:** | 10/8/98, by Dr. Borer @ Catholic Social Services |
| **DATE OF LAST IN-PERSON MEDICATION VISIT:** | 9/23/02, patient has followed with a different psychiatrist since her insurance changed. |

Additional source of information available for clinical information: therapy records at Catholic Social Services.

I have been asked by Deborah Angelini to provide a summary of her concerns and mental status around the time of her son's arrest in 2000, and around the time of his sentencing in August 2001.

I was initially consulted October 8, 1998, by Ms. Angelini for psychiatric support and medication intervention related to features of Generalized Anxiety Disorder, Cyclical Depression, post-traumatic flashbacks related to intimidation and abuse she suffered as a child and in her marriage, Attention Deficit/Hyperactivity Disorder, and Mixed Specific Developmental Disorders in Spelling, Reading, and Writing. At that time, I recommended support through Vocational Rehabilitation for remediation and accommodations related to her learning disabilities. I recommended therapy to process past abused and support her current relationships. I also documented, in my October 1998 report, giving her ideas for follow up to help her son, who was apparently experiencing anxiety and depression of his own.

At the time of my initial intake, she reported low esteem issues related to her learning disabilities as a child and as an adult, as well as her experience of a rape as a young teen by someone outside of the family. She stated at that time that she experienced early marriage and pregnancy by her husband, who was physically and emotionally abusive of her, and she reports that she experienced the brunt of his "sadistic" behaviors toward her. She states that she had to witness her son being raised in the home of this man, and that her son had attentional and learning difficulties as well, but was also developing substance abuse like his father. She, thus, saw her son in the process of inability to live up to role expectations and this was a great source of trauma and grief to her, leading her in the early '90s to hospitalization and treatment for at least a mood disorder. She experienced further trauma by having to go through a hysterectomy at a young age because of infection by her unfaithful husband, and reports that upset hormonal cycles led to aggravation of her mood disorder.

A-21