*Angelini, Deborah "Debbie"*
*Summary of Prior Psychiatric Treatment, 3/28/03*                                  2

To her credit, she had been recognized as a self-advocate in that she attempted to complete seventh grade numerous times, but when she was unable to do so because of her learning disabilities and had to drop out of school, she went on to earn her GED and has attended college, aware that she has good intelligence. She has sought therapy in the past, prior to my evaluation of 1998, and was currently continuing to process post-traumatic flashbacks and grieve the pain of her earlier years. She reported developing a relationship with someone who was not abusive of her and continued to work toward long-term goals including earning her degree, getting married, trying to help her son, and trying to seek appropriate employment.

During the time I worked with Debbie at Catholic Social Services, where she continued in treatment with a therapist, I would see her on approximately a monthly or every-other-monthly basis. She often was going through bouts of depression, and we attempted a number of different medication interventions which she would comply with until marked side effects would occur. She appeared extremely sensitive to medications and this has led to difficulty finding medications to alleviate her vegetative signs of depression. This has been an ongoing struggle. She continued to wrestle with depression and anxiety, while she processed the pain of her past and continued to move forward with her attempts at college with support through Vocational Rehabilitation.

As of September 9, 1999, Debbie reported a back injury while at work, but she has continued to seek out schooling and work while attempting to recover from her injury. Around that time, she reported getting little family emotional support because her parents are deceased and she reported infrequent contact with her brothers. She did report getting emotional support from long time friends, as well as from her son. She continued to utilize her therapy appropriately.

By April 13, 2000, I considered the disorder of Bipolar II, based on Debbie's history of depression, but also based on a tendency toward "inner revving" on various antidepressant medications. This mood swing disorder, apparently, made her more intolerant of various antidepressant and mood stabilizing medications. As of April 13, 2000, despite the need for continued treatment, she was described as functioning better in her overall life, with more positive outlook. She was working on her resume and applying for jobs.

As of April 13, 2000, Debbie noted that her son had positive things to say about her to a friend, which made her feel very proud.

Discussion regarding son's arrest in 2000: As of May 13, 2000, Debbie reported in a visit with me that her son had been arrested for stabbing and killing his stepmother. She spontaneously volunteered at that time that her son had history of problems with attention, had been a head banger when he was very young, and growing up her girlfriend told her, "He needs help." He was teased a lot for wearing glasses, problems paying attention, and talking too much. (Attention deficit and learning disability problems.) She reports that she and his father split up when he was seven years of age. Prior to that, his father would not let her work with the school on her son's behalf. She reported that his father was physically abusive of him and would not allow her to tell his mother about it. She only knew about it after her son left the home of his father. This was painful to her because she had hoped her son would be spared the physical and emotional abuse that she experienced by his father. She states that his father "kidnapped" him from North Carolina when she



*Angelini, Deborah "Debbie"*                                                                                    3
*Summary of Prior Psychiatric Treatment, 3/28/03*

went there to get away from his father. She reported at that time that her son and his stepmother get along, but this is competitive to dad. This is his second stepmother since the divorce between his mother and father. This woman has been in the picture since her son was age 14 and her son was now 19 years of age.

She stated her son had been hearing voices since the summer. She stated that he had talked to someone at the Mental Health Clinic and told his mother, "If you were in my head, you would not be able to live." She reported that he had used substances that she believed to be provided by his father. She stated that he had a newborn baby who was several months old but that her son was not ready for marriage. She stated she was not sure that his father would get an attorney for him. Her son told her that he took his stepmother's Xanax and was using marijuana. After coming to talk to his mother, he turned himself in. She expressed concern and worried that his father may have had an influence and that his father had been talking about possible divorce from stepmother. She stated that in the past she had sent a letter to the judge, five to six years previously, trying to get help for her son and fearing his actions if he stayed with his father.

At the time of this information sharing on May 15, 2000, I saw Debbie at risk for depression and intensification of post-traumatic stress disorder. At the time of my interview on May 15, 2000, with Debbie, she reported decreased sleep, increased traumatic nightmares, average mood but frequent crying, feelings of hopelessness in the face of emptiness, hurt and a lot on her, scared for her son, mistrusting of his father as an advocate for her son, and poor concentration. I recommended increased therapy time for support. We continued to adjust medications. As of May 26, 2000, Debbie requested a cancellation appointment stating, "I'm having trouble dealing with my grieving." We tried to arrange for additional therapy through Catholic Social Services.

As of June 5, 2000, she had asked for recommendations for who might evaluate her son psychiatrically and names of local professionals were provided. By June 14, 2000, she reported increased depression in the face of back pain and stress of worry about her son. She had increased vegetative signs of depression. Luvox was helping some, but there was some overstimulation on this medication. Other medications were too sedating. She reported that her son had a court appointed attorney and that she visits him regularly, and that his father was not visiting him. She continued to struggle with trying to center herself and her own thought process, so that she could be more effective in helping her son.

By August 16, 2000, Debbie reported continued fears for her son. She reported that some of her own trauma was recurring, mentally, when she faced what she sees as "deceptions by her ex-husband." She reported "fair" mood on current medications. She was working part time and continuing to seek advocacy through Voc Rehab.

Debbie's mood continued to gradually improve and in 2001 she provided me with an extensive set of notes to help me understand how her son may have been negatively influenced by his father. By March 8, 2001, she was convinced that her son did not commit murder, but rather was left "holding the bag" for his father and would have done this under the influence and threat of his father, who may have threatened his mother's life should he tell. She genuinely feared that her son's father would support harm being done to her, based on her past history with him. She had a fear that she was being followed, but her mental status examination was not noted to be otherwise abnormal.

A-121   P946

*Angelini, Deborah "Debbie"*                                                                        4
*Summary of Prior Psychiatric Treatment, 3/28/03*

As of April 18, 2001, Debbie reported marked anxiety and deep depressive features. She continued to complain of side effects to low dose medication, as had been typical for her. She was feeling overwhelmed, agitated, frustrated, angry, and stressed, as well as completely drained. She experienced some mood congruent visions, which she perceived as a possible cry for help by her son's stepmother from beyond the grave. This type of thought process had never been witnessed during my prior evaluations of Debbie, and I believe represented the degree of stress that she was feeling at the time.

By July 12, 2001, we discussed her son's murder conviction at length, and she still stated that she believed he was not guilty and that his father may have been the actual murderer. She stated that her son told her later that someone else had committed the murder. Her vegetative signs of depression remained reasonable, given the level of stress that she had been through. There was no evidence of overt psychosis at that time. She continued to visit with her son in prison.

Sentencing of her son: By my follow-up visit of October 11, 2001, she reported that her son had been sentenced to life in prison. She reported just returning to therapy following a lull in which she had needed time to recenter herself. By January 10, 2002, she stated that following her son's sentencing to life without parole in August 2001, all her stuffed in feelings started coming through. She reported looking for a new attorney for her son, to follow up with an appeal. She was advocating and writing on her son's behalf, feeling that things were not working out for her son legally. She had broken up with a boyfriend of six to seven years and felt abandoned by him. She stated that she has to work hard to block out painful feelings in order to go through advocacy actions on behalf of her son. She reported depression, and was considered at further risk for increased vegetative signs. She continued to show difficulty tolerating medications. She benefits from therapeutic support, as well as reading and turning to her faith. She reported easy agitation, frustration, and anger, which was interfering with her personal relationships, and reported taking an incomplete in her class and being unable to work at gainful employment. She did not want to waste time.

By March 27, 2002, a phone message revealed, "My emotions are running wild and I can't handle them." As of April 22, 2002, I saw Debbie for follow up at Children and Families First, a new agency for her, where she was working with a new therapist. She reported continued frustration in interacting with attorneys while trying to advocate for her son. She was feeling overloaded with thoughts and feelings and continued to feel that these were affecting her relationships. She was reporting flashbacks to past trauma. Her statements of grief included her view that, during her son's trial, she was too emotionally overwhelmed to adequately prepare, answer, or defend anything relating to her son and that it is still painful for her to fight back internal fears, anxiety, and anger when trying to face her son's legal issues. These post-traumatic features were continuing to interfere in her sense of being adequately able to advocate for her son, as well as to apply herself at school. She was reporting that she was still experiencing back problems and was seeing a chiropractor. She reported depressive features and still having visions and dreams which appeared prophetic. She reported daytime flashbacks which were easily triggered, frequent crying spells, hopeless feelings, no current voices but dreams that appeared to be revelations. She reported some panic attacks and she reported trying to continue therapy, deal appropriately with her anger and frustration, and to pray and meditate. She reported feeling time urgency, in terms of trying to advocate on her son's behalf.



*Angelini, Deborah "Debbie"*                                                                         5
*Summary of Prior Psychiatric Treatment, 3/28/03*

By July 8, 2002, Debbie reported that she still feels that her anger and traumatic memories can rev her up. She tries to sublimate her anger and frustration into motivational drive. She has been less sad or weepy and has had higher energy. She continues to feel the need to process in therapy both her traumatic past and to cope with present stresses. She reports feelings of agitation, but reports no voices or visions. She continues to worry about things getting done in a timely manner. She states that her son is insisting to her that he did not kill anyone and wants her help with an appeal. She continues to seek support through group therapy, as well as individual therapy.

By September 23, 2002, the last in-person contact I had with Debbie prior to being asked to do this present report, she reported some depressive tendencies were persisting while she was still appealing her son's murder conviction. I wrote the following note on that date: "To Whom It May Concern: I have worked with this woman since October 1998 for issues related to anxiety, cycles of depression, learning difficulties (reading, writing), and PTSD related to trauma in the past relationship with her ex-husband. She has fought back against her difficulties and has earned a B.A. degree. She has continued to advocate for fair and legal representation and a fair trial for her son and should be able to participate at this point on advocating on his behalf."

It is my hope that the above information has been helpful in giving a sense of this woman's state of mind when I initially saw her, at the time of her son's arrest, at the time of his trial, and at the time of his sentencing.

Sincerely,

Mark S. Borer, M.D.

MSB/lbl



September 5, 2002

Nicole/Eddie Meredith

(302) 629-7017

Airport Rd.

Seaford, DE 19973

     I visit the residence of Nichole on the five of September. I was there to interview the person or persons who may have possible had go-cart parts that could and would verify rather Willie was ever there to get any at or during the time of his stepmothers death. Nicole gave me her friend's name that lives with them and said they have lived there for the past five years or more. So that would be from 1997 to current. Nichole did not recall anyone ever coming to their residence to question them at the time of Sherri Hassett's death. According Nicole no one had ever visited them and asked questions. Nicole gave me her phone number to call back later when the man who stays there by the name of Eddie Meredith would be home from work so I could talk to him. I spoke to Eddie on the phone September 6 2002. I first explained to Eddie the purpose of the phone call. I informed Eddie that this was a re-investigation to correlate some of the stories because there are some that match and some that don't. Also, that there is some legal issues that might get Robert an appeal because of the stories that were not checked out to confirm if truthful or untruthful. I asked Eddie if he would be willing to give me a statement and talk to Willies attorney if need be. Eddie 's response was he would comply with no problem.

I asked Eddie if he did know Robert Hassett or Willie. Eddie confirmed that he did know Willie. I asked Eddie if he could recall Willie coming to his house the night before his stepmother's death to get a go-cart part. Eddie's response was yes Willie has come there before to get some go-cart parts. He thinks it was about the time that his stepmother was killed. However, Eddie did say he couldn't be absolute because so much time had past. Eddie did say that he does know for sure and does remember that Willie had been there for go-cart part and he does think it was around that time frame. My next question to Eddie was has anyone ever talked to him about Robert Hassett at the time of his

 

stepmother's death. According to Eddie no one ever did come to talk to him or asked him any questions.

Eddie maybe contacted at the above phone number for further questioning. Other question maybe how well did he know Willie or how long?

*Briefly Knew Willie from Hopkins, And give Willie ride home*

Does he recall if Willie had brought go-cart parts from once, twice, three, or more times prior to going to jail.

Additional Comments:

*a couple times and give a go-cart parts, unsure thinks maybe just 1 or 2 maybe 3. But does remember Willie setting a part [go cart] between that time of Sherri's death.*

Signature:

Deborah Angelini *Deborah Angelini*

Eddie Meredith *Eddie Meredith*      9-8-02

Witness _____

Notary _____



Memo to Eddie Meredith:

Did Willie come up on four-wheeler Ⓨ or N? *Believe Willie did just can't be absolute time frames!*

Did Willie have another person with him on the back of the four-wheeler Ⓨ or N?

F-115-4-23 Willie statement.

Do you have a front porch night light Ⓨ or N?

Did you get a good look at the guy that was with Willie that night Y or N?

Could you identify him if you were to see him again Y or N? *Don't think so*

Page 10-11 Do you remember what kind of cloths Willie had on Y or N?

Could you recall rather or not you ever seen Willie with ⓢhorts or long baggie pants Y or N? *Thinks can't recall.*

N? Did Willie seem to wear ⓑaggie long pants most of the time you ever seen him at work or off work if you can answer? *Can't recall for sure. Thinks*

F-106-4-7 According to Willie the man that he got the go-cart from lives 3 quarters a mile maybe a mile from his home and is unsure of his name. He had been there a couple of times for go-cart parts though.

F-105-22 According to Willie the only man he knew on Airport rd. is the one he got go-cart parts from. In addition, gave him a ride home a couple of times.


Signature:

Deborah Angeling _____

Eddie _____

Witness/Notary _____



A-22

pg 51

F-149



1              MR. ADKINS:  Thank you.  No further

2     questions.

3              MR. BARNETT:  May I see the police report and

4     the notes?

5              MR. ADKINS:  You have a copy.

6              MR. BARNETT:  The notes?  I have a copy of

7     the police report.  I don't have the notes.

8              THE COURT:  Yes, you may.

9              MR. BARNETT:  If I do, I'm not aware of it.

10             MR. ADKINS:  Yeah.

11                       CROSS-EXAMINATION

12    BY MR. BARNETT:

13        Q.   You are saying, Detective Brown, that these

14    quotes, the quote that you read into the record here:

15    You are not going to get anything, I never touched

16    her, I seen it happen, I have changed my clothes in

17    the woods and I put them in a barrel near where the

18    car was damaged, that's exactly what the defendant

19    said?

20        A.   That's correct.

21        Q.   And the reason -- you are positive this is

22    from your notes; is that correct?

23        A.   I wrote it down as he was saying it.

A-23

DAVID WASHINGTON
Official Court Reporter





DET. ROBERT HAWKINS - CROSS

1    from him.  He wasn't going anywhere.

2           MR. BARNETT:  May I have a moment, Your

3    Honor?

4           THE COURT:  Yes.

5           (Pause.)

6    BY MR. BARNETT:

7       Q.   Before you testified here today, did you

8    refer to any police notes or police reports?

9       A.   Yes, I always review by notes.

10      Q.   You did?

11      A.   Yes.

12          MR. BARNETT:  May I see those, Your Honor?

13          THE COURT:  Yes.  Take your time.

14          THE WITNESS:  I have them.

15          MR. BARNETT:  I might have them right here.

16   It might help, Your Honor, if we both had a copy.

17   This may take me a while to review.

18          THE COURT:  That's fine.  Would it be helpful

19   to have a luncheon recess and come back?

20          MR. BARNETT:  It might be, Your Honor.

21          THE COURT:  We will stand in recess until

22   1:20.  One hour for lunch.  Let the jury go.

23          (Whereupon, the jury was excused and left the

A-24          Pg53

DAVID WASHINGTON
Official Court Reporter



C-28

DET. ROBERT HAWKINS - CROSS

1          courtroom.)

2               THE COURT:  We will stand in recess.

3               (Whereupon, Court stood in recess until 1:20

4          p.m.)

5               THE COURT:  Bring the jury in.

6               (Whereupon, the jury returned to the

7          courtroom.)

8               THE COURT:  Good afternoon.

9               MR. BARNETT:  Thank you, Your Honor.

10     BY MR. BARNETT:

11          Q.   Captain, you testified earlier and identified

12     I believe some clothing.  You identified this shirt, I

13     believe, which is State's Exhibit 14; is that correct?

14          A.   Yes, sir.

15          Q.   That's the B.I.G Notorious shirt?

16          A.   Yes, sir.

17          Q.   How would you describe that shirt?

18          A.   It is a black tee shirt with the letters

19     B-I-G across it with the picture of a rap star.

20          Q.   Do you recall talking to Gladys Crockett?

21          A.   Yes.

22          Q.   You have a copy of your notes where you

23     interviewed Ms. Crockett?

A-24





DAVID WASHINGTON
Official Court Reporter

Law Offices

# Thomas David Hunter Barnett

512 East Market Street
Georgetown, Delaware 19947
E-mail: TDHBLawyer@aol.com

Telephone: (302)855-9252                         Fax:  (302)855-9293
Cell Phone: (302)228-5568                        Pager: (302)441-6567

June 5, 2001

Honorable Richard Stokes
Judge, Superior Court
P. O. Box 746
Georgetown, DE 19947

     RE:  State v. Robert W. Hassett
         ID#  0005011315

Dear Judge Stokes:

The following is my reply to your letter of May 7, 2001, regarding Mr. Hassett. I appreciate the extension of time you granted me to respond so that I could complete and file a brief due in the Delaware Supreme Court.

I received Mr. Hassett's case in July, 2000, when I replaced Ron Phillips, Esquire, as Conflict Counsel. I do not recall the dates I met Mr. Hassett in the courthouse but recall two meetings. On July 21, 2000, I met with Mr. Hassett at the courthouse and he executed the enclosed release.

The first time I visited him in prison was February, 2001, but my notes do not reflect the exact date, although Mr. Hassett and I recall that the visit was interrupted by a "lockdown" and I was ordered to leave. The visit lasted more than an hour but was less than two hours. During that visit we discussed the facts and trial strategies.

In early September I forwarded Mr. Hassett all discovery that I had received on August 31, 2000. (See attached.) I subsequently provided Mr. Hassett with all other discovery as it was received from the FBI.

In July, 2000, I received from the court a long typewritten letter from Mrs. Deborah Angelini, which I reviewed along with numerous other documents from Family Court, which Mrs. Angelini provided me. I discussed these with her by phone and in person when she would appear in my office.

Further, I reviewed correspondence from Mr. Hassett's aunt, June Bramble, and spoke with her by phone when she called me regarding the letters. One letter was dated December 2, 2000, and the last was dated April 12, 2001.

Also enclosed is a copy of my July 26, 2000, letter to Mrs. Angelini, with a copy to Mr. Hassett.

On October 24, 2000, I spoke with Mrs. Angelini in my office and tried to review her son's case with her as best I could. In reviewing her letter of November 14, 2000, to the Court I note she claims her son could face the death penalty. This is not so and I believe she may have misunderstood me as I recall telling her that he would not face it but could get life in prison. Further, I did not tell her that I would turn over any information she provided me to the prosecuting attorney.

On December 7, 2000, I spoke with Mrs. Angelini on the phone and discussed the status of her son's case and tried to answer her questions.

I also spoke with David Sibley, M. D., in Dover regarding a possible mental examination but after meeting with Mr. Hassett at the prison that idea was discounted as a defense.

A review of my file regarding my contacts with Mrs. Angelini shows the following notations:

February 5, 2001-Reviewed DNA Reports sent to her son with her in my office;

March 1, 2001-Phone call regarding appointment to review evidence;

March 5, 2001-Phone call asking that case be continued;

March 8, 2001-Phone call asking me to withdraw from her son's case;

March 19, 2001- Phone call regarding evidence in case and her being allowed to be present . Also discussed "Jason" and his possible involvement in the murder. I told her I would notify her of the date and place we could review the evidence with her son and the police.

May, 2001- On an unknown date I informed Mrs. Angelini by phone of the date we were to review the evidence at Troop 4.

May 24, 2001-Met Mr. Hassett and Mrs. Angelini at Troop 4, Georgetown, and reviewed all evidence from 1:30 p. m. until approximately 4:30 p. m.

I am scheduled to meet with Mrs. Angelini at 3:30 p. m. in my office on June 5, 2001, to give her copies of all witness statements provided to me on May 24, 2001.

On May 9, 2001, I met Mr. Hassett at SCI and we again reviewed all evidence received to date and discussed the defense of his case. He expressed no concerns at that time over how I have

A-25
PG 86
SUP.

handled his case and said the letters were sent at his mother's request.

On May 24, 2001, Mr. Hassett reviewed the evidence with me and his mother and was shown everything in the state's case.

I intend to hand deliver to him today at SCI all the witness statements for his review and to discuss those statements with him either June 7th or June 8th after he has had time to read them.

Please advise me if you need further information regarding the efforts of defense counsel in this matter.

Respectfully submitted,

Thomas D. H. Barnett

1          AFTERNOON SESSION

2                    (Whereupon, the following proceedings were

3              had in Judge's Chambers:)

4                    THE COURT:  This is a conference with

5     counsel in chambers.  It has just been reported by

6     Mr. Barnett that he had received information from a

7     spectator, a woman named Bramble, that possibly

8     Juror No. 2 may have had an encounter with a member

9     of Sherri Hassett's family.  Ms. Bramble is not

10    present as we speak, having departed the courtroom.

11                   My intention -- I'll let counsel speak to

12    it -- would be to have Juror No. 2, Gail Beauchamp,

13    examined by me to see if, in fact, it was any

14    contact.  And if there was any contact, to determine

15    the nature of it.  Does either side have anything

16    that they would like to say?

17                   MR. BARNETT:  The defense has no comments,

18    other than possibly if we could do it in chambers

19    rather than do it in front of all the spectators.

20    It might be less embarrassing for the juror.

21                   MR. ADKINS:  Well, it might be a good idea

22    to speak with this Juror No. 2 in chambers, because

23    we are dealing with a possible contact with a

B-90

1    spectator, who's probably sitting in the room right

2    now.' So I guess that's the only way to get to the

3    bottom of it, just make an inquiry to Juror No. 2.

4              THE COURT:  All right.  That's what we'll

5    do then.  Why don't you, Mr. Joyner, bring Juror No.

6    2 in, please.

7              (Whereupon, Juror No. 2 reported to

8         chambers and the following proceedings were

9         had:)

10             THE COURT:  Hi.

11             JUROR NO. 2:  Hi.

12             THE COURT:  How are you doing?

13             JUROR NO. 2:  Just fine.

14             THE COURT:  You are Ms. Beauchamp?

15             JUROR NO. 2:  Uh-huh.

16             THE COURT:  And you are Juror No. 2?

17             JUROR NO. 2:  Uh-huh.

18             THE COURT:  I just want to ask a question

19    of you, if I may.  Did you have any contact with any

20    outside people in the courthouse at all?

21             JUROR NO. 2:  Today?

22             THE COURT:  Today.

23             JUROR NO. 2:  No.

1A-26

KATHY S. PURNELL
OFFICIAL COURT REPORTER

  

pg59

1          THE COURT:  Did anyone approach you about

2     this case at all?

3          JUROR NO. 2:  No.

4          THE COURT:  Did anyone introduce himself or

5     herself to you at all?

6          JUROR NO. 2:  No.

7          THE COURT:  And is that true not only of

8     today, but yesterday?

9          JUROR NO. 2:  Yes, sir.

10          THE COURT:  We were just being extremely

11     careful.  Thank you.

12          JUROR NO. 2:  Okay.

13          THE COURT:  Just step outside for a second,

14     please.

15          (Whereupon, Juror No. 2 exited the room.)

16          THE COURT:  Does either side have any

17     further questions?

18          MR. BARNETT:  No.

19          MR. ADKINS:  No.

20          THE COURT:  All right.  I've had an

21     opportunity to observe Juror No. 2.  She sounds like

22     she rings true.  I'm not finding there is any basis

23     established for disqualification.  Okay.  Let's

A-26                      ♪♪ 60

KATHY S. PURNELL
OFFICIAL COURT REPORTER



K. HAWKINS - Cross          B-92

1    return to the courtroom.

2              MR. BARNETT:  I agree, Your Honor.  I just

3    simply needed to bring it to the Court's attention.

4              (Whereupon, the proceedings in Judge's

5              Chambers concluded, after which the trial

6              reconvened at 1:43 o'clock p.m., and the jury

7              returned to the jury box.)

8              THE COURT:  All right.  You may question.

9    BY MR. BARNETT:

10       Q    Good afternoon, Ms. Hawkins.

11       A    Hi.

12       Q    My name is Tom Barnett.  I'm going to have

13   some questions for you.

14       A    Okay.

15       Q    I represent Willie Hassett.  Did you give a

16   statement to the police at the time of this incident

17   on May 14th?

18       A    Yes, I did.

19       Q    Do you remember the substance of that

20   statement right now?  Do you remember what you told

21   the police?

22       A    Yes.

23       Q    I believe you had testified on direct

11-12-00

To whom it may concern,

    I am writing this letter as a co-motion. I am asking for my lawyer, Mr. Barnett to be dismissed from my case. And to be appointed a new lawyer. Mr. Barnett has made no attemps to come see me and discuss my case. After numberous letters. He has spoke with my mother and told her that he can not communicate with young people, and he was going to send a detective to talk with me. This was over a month ago.

    And how am I suppose to talk with a detective. When that is not confidential. And this detective can go back and say what he wants Mr. Barnett to hear. Not the truth. Also how can Mr. Barnett put together a defense without speaking with the defendant. There are many other reasons I have for my motion to dismiss Mr. Barnett. And if you are concerned of what they may be. Please contact me.

                              Sincerely,
                              Robert W. Hassett 3rd
                              Robert W. Hassett 3rd





A-27                                      P962

10-16-00

Dear Mr. Barnett,

I am writing you in my behalf, Robert W. Hassett III. I have wrote to you numorus times and had no response. And my mother has called your office numorus times, and even talked to you. And you still have not come to see me and discuss my case with me.

Now I'm not writing this letter to discourage you, but to ask you why have you not came to see me? A reply would be nice to have within a reasonable amount of time. If you feel you can not handle my case, please let me know. Or if you just needed time to review my case, please let me know.

Thank you,
Robert W. Hassett 3rd
Robert W. Hassett 3rd

A-28

Pg 63

SUPERIOR COURT
OF THE
STATE OF DELAWARE

RICHARD F. STOKES
JUDGE

P.O. BOX 746
COURTHOUSE
GEORGETOWN, DE 19947

November 28, 2000

Thomas D.H. Barnett, Esquire
512 East Market Street
Georgetown, DE 19947

RE:    State v. Robert W. Hassett
        ID #0005011315

Dear Mr. Barnett:

Enclosed you will find copies of letters from your client and his mother filed on November 22, and a motion to disqualify filed on November 14. Your client filed a duplicate of his mother's earlier letter today

These filings are an expression of discontent. I expect that once you have received these materials any problem will be resolved. I will not grant the motion to disqualify under these circumstances.

Very truly yours,

Richard F. Stokes
Judge

RFS:mrs

Enclosures

cc:    Mr. Robert W. Hassett
        Ms. Deborah Angelini
        Prothonotary

A-29                    PG 64

1    intention to kill her.

2          Credibility of the witnesses and conflicts in

3    testimony. Jason and the defendant. They are so

4    inconsistent as to be extreme opposites. Where are

5    Jason's clothes? Why did Jason run? Why did Jason not

6    call the police?

7          Everything that Mr. Cosgrove said, and

8    everything I said, and everything Mr. Adkins is going

9    to say is not evidence. It is our argument. It is

10   what we think the evidence has shown; our interpre-

11   tation of that evidence. You must decide, after having

12   heard this case, what the evidence is. You must decide

13   the "Who?"

14         Thank you.

15   MR. ADKINS: I probably shouldn't ask

16   everybody to raise their hand who is tired of hearing

17   lawyers talk because I might get a bad reaction. And

18   here I am up here to talk to you some more.

19         This is rebuttal, and, therefore, it is not a

20   total rehash of the evidence. It is to rebut anything

21   that the State chooses to comment upon that Mr. Barnett

22   has said to you in his closing. So I intend to hit

23   briefing, hopefully concisely, upon certain points and




1   then move on.  This will not be as long as either of

2   the closings that you have heard.  So relax and know

3   that it won't be that long.

4           Mr. Barnett asks, "What is the motive?  Where

5   is the motive?  They haven't shown motive."  Ladies and

6   gentlemen, after listening carefully to the evidence,

7   you know that the motive is basically all of the above.

8           It starts out being a bad relationship

9   between the defendant and George and Sherri.  The

10  defendant is definitely playing second fiddle when

11  Sherri and her kids come into the picture.  He is put

12  into a room with other kids, Sherri's kids.  Not his

13  full brothers or his father's children, but Sherri's

14  kids.  He is in a small space.

15          It comes to a point where he is even put

16  outside to live in that camper.  It comes to a point

17  where he moves back with his mother.  It comes to a

18  point where he is back down here and they have given

19  him his own little apartment on the end of the house.

20          But the bad feelings and relationship doesn't

21  stop then, because then we have his complaint about

22  Sherri's wanting marijuana.  We have the complaint

23  about the music and about the four-wheeler.  He just

1    can't live his life the way he wants to live it.  And

2    the complaints all the time.

3            He mentions on the stand that, you know, if

4    there is some controversy and Sherri says one thing,

5    who gets the blame?  He gets the blame.  Now, he

6    doesn't resent that much, does he?  So it all comes to

7    a head on Saturday night, May 13th, when there is this

8    argument, cursing, and upset over the phone.

9            Although we know that he has had the feeling

10   that he is going to have to move out of there and find

11   another place to live, he knows it on Thursday when he

12   is talking to Mr. Robinette.  It comes to a head on

13   that Saturday night, and he knows he is kicked out.

14           Who in the world is the defendant going to

15   blame for getting kicked out of his apartment?  Sherri

16   Hassett.  That's what he says to Robinette.  "If that

17   bitch causes me to get kicked out, I will kill her.  I

18   will kill her."  The evidence shows that that came

19   true, ladies and gentlemen.  That came true.

20           Then with regard to the motive, Mr. Barnett

21   tells you about --- we have the big switcheroo defense,

22   if you will.  It is the defendant who has the bad

23   feelings toward the Hassett family.  It is his

 

1    stepmother, his natural father, and his apartment that

2    he is being kicked out.

3         But the big switcheroo that they want you to

4    accept and believe is that now that is Jason's motive.

5    It is not Jason's stepmother, not his father, and not

6    his apartment. He is not being kicked out. But the

7    switcheroo is that that is now Jason's motive because

8    the defendant is his best friend. Are you going to buy

9    that type of switcheroo in this case?

10        Mr. Barnett says that none of the facts in

11   evidence prove who did it. Possibly he is referring to

12   the physical evidence in the case. What has been

13   proven through the F.B.I. exams and through testimony?

14   What physical evidence connects the defendant to the

15   murder of Sherri Hassett?

16        Think about it, ladies and gentlemen. He

17   admitted to you on the stand -- he has sat here

18   throughout the entire trial. Before he takes the

19   stand, he has been able to listen to what every single

20   witness in the State's case said. He has been provided

21   with and looked at all transcripts of all the State's

22   witnesses. He has been provided to view all the

23   physical evidence that the State has against him. Then

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER    30

Ex-A-201    pg    68

1    he takes the stand and explains it. Does that take a

2    rocket scientist?

3                    The jeans, the cut up jeans. Then the shirt

4    with the blood on it. Let me address that for a

5    moment. Why was it important to test the defendant's

6    tee-shirt that has "Ride or Die" on it? Why was that

7    important? It was important, ladies and gentlemen,

8    because the police took that shirt off of the

9    defendant's back themselves at the hospital.

10                   That shirt is the shirt he was wearing, and

11   you know that now because he even admits on the stand

12   that that's the shirt he was wearing. That was tested,

13   and the proof is, to a reasonable degree of scientific

14   certainty, within quadrillions and quintillions, that

15   Sherri Hassett's DNA in the form of blood is on his

16   shirt.

17                   That is the shirt that was taken physically

18   off of him and that he was wearing during the incident.

19   When the police got hold of him, he didn't have those

20   cut up jeans on. They were in somebody else's custody

21   and they were obtained later. As you know if you

22   listen to the May 17th tape that Deborah Angelini gave,

23   they were in somebody else's custody. They were taken

1    later.

2            Mr. Barnett says there is only one speck of

3    blood on that tee-shirt.  Please recall the testimony

4    of Deborah Hobson with regard to that.  Didn't she

5    testify that she tested that area and that came back as

6    a positive that it was blood?  That the source of that

7    is Sherri Hassett?

8            There was no testimony elicited where the

9    expert said, "I can tell you for sure there is no other

10   blood on that tee-shirt."  There was no testimony

11   elicited to that effect.  There is a big difference

12   between, "I tested this part and this is Sherri's

13   blood," and the other thing that wasn't testified to,

14   that there is no other blood on this tee-shirt.  There

15   is a big difference there.

16           Who is the expert who came and testified at

17   this trial who said that if you stab a person numerous

18   times, each one of those stab wounds is going to be

19   like a geyser spurting blood out over the person who

20   stabs the victim and that you are going to be totally

21   drenched in blood?  Who is the expert who said that

22   that Mr. Barnett is relying upon to try to convince you

23   that the assailant would have to have blood totally